**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

**SEDAKER GROUP OF SOUTHERN CALIFORNIA INC., ANCJ, LLC, CAPIRE, LLC, and TAYDEN ENTERPRISES LP,**

**Plaintiffs,**

**vs.**

**DIRECTBUY INC. and DOES 1 through 100,**

**Defendants.**

**Cause No. 2:15CV198-PPS**

## OPINION AND ORDER

Four California franchises have brought this suit against the franchisor, DirectBuy Inc., alleging breach of the franchise agreement. The case was transferred here from the Central District of California because it is related to a similar case before this court brought by DirectBuy Inc. against the same four franchises plus three others (*see* Cause No. 2:14CV91-PPS/JEM). Presently before me is a motion brought by DirectBuy seeking dismissal of the first amended complaint in the case transferred here from California. To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face," which in turn requires factual allegations sufficient to permit a reasonable inference that the defendant is liable for the misconduct alleged. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The first amended complaint contains three counts, all alleging that DirectBuy breached the franchise agreement by charging its franchisees fees that were not authorized by the agreement. Counts 1 and 2 are brought by plaintiffs Sedaker Group (the former franchise of West Riverside), ANCJ (the former franchise of East Bay), and Tayden Enterprises (the former

franchise of San Diego North). Both counts challenge DirectBuy's imposition of excessive "media expenses" – in Count 1 on the ground that the fees were unreasonable and in Count 2 on the ground that the media expenses exceeded a 3% limitation applicable under §3.03 of the agreement. Count 3 is the claim of plaintiff Capire (the former franchise of Sacramento), similarly alleging that the media expenses violated its franchise agreement (a later version than those executed by the three other plaintiffs) because the fees were unreasonable and exceeded the 3% cap.[1]

The gist of the disagreement between the parties is which provision of the franchise agreement authorizes and governs the imposition of the fees that DirectBuy calls "sales-lead charges." There are a number of provisions of the franchise agreement potentially at issue in this case. The parties dispute which provision, if any, of the franchise agreement applies to these fees. The potentially relevant provisions are somewhat ambiguous and at times seemingly contradictory. The first provision of the franchise agreement that is potentially relevant is §3.03. Here is what it says:

> **3.03 <u>Marketing and Legislative Fund Contributions</u>**. You agree to contribute (at such times as we may designate from time to time) to the Marketing and Legislative Fund $1,000 during each of our fiscal years, except that you are not required to make any contributions during the first 12 months in which you operate your Center. We have the right from time to time to increase the amount you are required to contribute to the Marketing and Legislative Fund, provided we may not increase the amount of your contributions to more than 3% of the gross amounts you charge for new memberships (including renewal option fees, but excluding renewal fees).

[DE 30-1 at 10.]

---

[1] Capire's Franchise agreement differs from the other plaintiffs' agreements in some respects, but is essentially the same with respect to §3.03, titled "Marketing and Legislative Fund Contributions."

Relatedly, Section 7 of the agreement also deals with the concepts of "Marketing and Advertising." Here's what it says, in pertinent part: "[DirectBuy] may, in our sole discretion, establish and administer a fund ("the Marketing and Legislative Fund") for the creation and development of marketing, advertising, and related programs and/or legislative, legal and regulatory defense programs relating to buyer clubs and other laws and regulations that affect DirectBuy centers." [*Id.* at 19.] Section 7.01 goes on to explain that DirectBuy "will have sole discretion over all aspects of programs financed by the Marketing and Legislative Fund, including creative concepts, media, materials and endorsements of marketing and advertising programs," and that DirectBuy cannot assure franchisees "that any particular DirectBuy center will benefit directly or pro-rata from the placement of advertising." [*Id*.] The Fund "may be used to pay for the cost of preparing and producing marketing and advertising materials and programs we select, including television and Internet media (such as Websites), video, audio and written advertising materials," and DirectBuy "may furnish [franchisees] with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges." [*Id*. at 19-20.]

There is yet another section of the franchise agreement which deals with marketing materials – that is §4.04. This case deals with two different versions of §4.04. As it appears in the earlier version of the DirectBuy Franchise agreement – the one signed by plaintiffs Sedaker Group, ANCJ and Tayden in 2004 and 2005 – §4.04 "grant[s] [franchisees] the right to use Marketing Materials, subject to such terms and conditions as we may impose from time to time." [DE 30-1 at 13.] The section further provides that the franchisees "agree to execute such agreements as we may require to protect our interests in connection with any Marketing Materials and to pay such reasonable charges for Marketing Materials as we may assess from

time to time." [*Id.* at 13.] Section 4.04 defines "Marketing Materials" as "sales and marketing tools and materials as [DirectBuy], from time to time, develop[s] and use[s] for DirectBuy Centers, such as infomercials, Internet marketing tools (e.g., member marketing websites), sales videotapes and sales materials." The scope of §4.04 and §7.01 appear to overlap in that both sections refer, for example, to marketing and advertising materials in similar areas such as websites and internet marketing.

The fundamental question to be answered in this case is whether the charges that the franchises complain of were assessed as contributions to the Marketing and Legislative Fund (under §3.03 and §7.01) or whether they were assessed as charges for Marketing Materials (under §4.04)? Or were they imposed as fees of some other kind altogether? What the franchises characterize as "media expenses" subject to the 3% cap, DirectBuy characterizes as charges for "sales leads" that are governed by §4.04 and not subject to any cap. To get to the bottom of the disagreement about the disputed charges, a number of subsidiary questions need to be resolved. These involve factual determinations that cannot be made at this time.

In arguing that Counts 1 and 2 should be dismissed because the charges plaintiffs complain of were authorized by §4.04, DirectBuy relies on the determination of a Pennsylvania bankruptcy court. *See In re Trinity Innovative Enterprises, LLC*, Case No. 09-20579-REF (Bankr.E.D.Penn. 2009). [DE 35-1 and 35-2.] Of course, *Trinity* has no preclusive effect because the plaintiffs in this case were not parties to that proceeding. But more importantly, the bankruptcy judge's determinations in *Trinity* involved factual findings based on an evidentiary hearing and record that included evidence concerning the history of the Marketing and Legislative Fund, the practices and methods for DirectBuy's assessment of fees to its franchisees generally and its history with the franchisee in that case. [DE 35-1 at 8-11.]

The procedural posture of the *Trinity* case demonstrates why I must deny DirectBuy's motion to dismiss. The bankruptcy judge in Pennsylvania had the benefit of full factual record before him; I have no such factual record before me at this point. When and if this case reaches a similar stage, I will give Judge Fehling's analysis the respectful consideration that is appropriate to such non-controlling authority. DirectBuy's argument presumes that I can somehow determine at this point in the litigation what the complained-of charges were for and what provision of the franchise agreement permitted them. But it's not that simple. The franchise agreement is at best confusing and at worse downright ambiguous. In order to sort this matter out, in other words, to determine which provision of the franchise agreement applies (if any), I will need the benefit of a full factual and evidentiary record, just as Judge Fehling had before him. At the present, I am not in a position to engage in contract construction and make determinations about the meaning and application of potentially ambiguous provisions of the franchise agreement.

The Capire franchise executed a slightly different agreement than the ones executed in prior years by the three other franchisee plaintiffs. In Capire's franchise agreement, §4.04 has been amended and refers repeatedly not to "Marketing Materials" but instead to "lead generation and marketing programs." [DE 30-3 at 47.] The word "reasonable" has been deleted from the provision expressing the franchisee's agreement "to pay such charges as [DirectBuy] may assess from time to time." [*Id.*] With respect to the Capire franchise's claim in Count 3, DirectBuy argues that the agreement's language "makes even more clear that §4.04 applies to sales-lead charges, rather than §§3.03 and 7.01" and that DirectBuy was not prohibited from charging Capire for sales leads relating to adjoining marketing territory. [DE 35 at 7.] This argument does not support a motion to dismiss. As with Counts 1 and 2, determinations about the scope

and application of the various sections of the franchise agreement cannot be made at this juncture, without the factual record that could be presented in the context of a motion for summary judgment.

DirectBuy makes another argument related to the agreement that Capire signed which is not contained in the franchise agreements signed by the other three franchisees. DirectBuy points out that Section 4.04 in Capire's agreement contains the following new paragraph:

> YOU ACKNOWLEDGE AND AGREE THAT WE WILL HAVE NO LIABILITY TO YOU, WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, FOR ANY DIRECT, INDIRECT, GENERAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY LEAD GENERATION OR MARKETING PROGRAMS OR OUR MODIFICATION OR DISCONTINUANCE OF ANY OR ALL LEAD GENERATION AND MARKETING PROGRAMS.

[DE 30-3 at 47](all-capitals in the original). DirectBuy contends that the revised version of the franchise agreement "explicitly waives all claims relating to DirectBuy's lead-generation and marketing programs." [DE 35 at 7.] DirectBuy invokes this exculpatory clause as a basis for dismissal of Capire's claims in Count 3, citing Indiana cases holding that such clauses are not against public policy and are enforceable where they are free from fraud and entered into knowingly and willingly. [DE 35 at 16.]

Again, the ambiguity of the various terms used in related provisions of the franchise agreement precludes construction of the agreement's language in the absence of a fuller record. Although I have had several DirectBuy cases presenting similar challenges by franchisees concerning the same DirectBuy program, I still don't know (because I have had no evidence on) what the program was, how it worked, what purpose it was supposed to serve, what was provided, what was charged, or what was done with the money. This makes it impossible for me

to determine that what Capire calls “media charges” fall within the exculpatory clause, even assuming it is enforceable, which Capire argues it is not. At this stage of the litigation, I am not persuaded to apply the exculpatory clause to dismiss Count 3, when I am unable to interpret the terminology in the agreement that defines the scope of the clause.

DirectBuy also argues that the first amended complaint doesn’t sufficiently allege facts plausibly supporting Count 1's claim that the media expenses were unreasonable. The pleading alleges that DirectBuy initiated a National Advertising and Marketing Program in 2007, mandated plaintiffs’ participation including their payment of marketing expenses attributed to their sales territories, in amounts unilaterally determined by DirectBuy. [DE 30 at 5.] Further, plaintiffs allege that the marketing expenses were increased even as the franchises’ membership sales and revenues declined in the great recession. [*Id.* at 5-6.] The specific impact of the allegedly unreasonable costs imposed by DirectBuy on each of the four franchisee plaintiffs is spelled out in the facts and figures alleged in ¶¶27 to 51 of the amended complaint. This pleading of the circumstances and context of the decline of each franchise as a result of the DirectBuys’s allegedly illegal fees is adequate under the standards of *Twombly* to constitute a factually plausible basis for an ultimate determination that DirectBuy’s charges were not authorized under the franchise agreement.

Finally, DirectBuy argues that in each of their Franchise agreements, the plaintiffs waived recovery of any “consequential damages.” [DE 35 at 22-23.] The first amended complaint alleges that the franchises suffered “out of pocket losses attributable to media expenses” and other fees, as well as “damages due to Defendant’s seizure/redirection of revenues earned by Plaintiffs,” lost profits and ultimately the loss of their businesses. [DE 30 at 21, 22,

23, 24, 27.] The prayer for relief seeks "general and special damages." [*Id*. at 27.] In response to DirectBuy's motion, the franchises contend that their claimed damages are "direct, rather than consequential" and so are unaffected by the language of the agreements. [DE 36 at 20.]

DirectBuy has done an inadequate job of analyzing both the nature of the damages the franchises seek and the law on what constitutes "consequential damages." Even if I were to grant this portion of DirectBuy's motion, it is not clear what I would be striking from the first amended complaint. And at this juncture, I am unable to identify with accuracy what species of damages would be properly characterized as "consequential." DirectBuy specifically challenges lost profits, but "lost profits are sometimes treated properly as direct damages and sometimes as consequential damages." *ViaStar Energy, LLC v. Motorola, Inc.*, No. 5-1095, 2006 WL 3075864, at *2 (S.D.Ind. Oct. 26, 2006) (Hamilton, J.). "The key to determining which classification is proper in a specific case is the degree to which the breaching party could foresee that the other party's lost profits would be a result of its breach." *Id*. This is clearly a determination that cannot be made at the motion to dismiss stage. But given the franchisor/franchisee relationship of the parties, the test distilled from the varied caselaw by Judge Hamilton certainly does not preclude a conclusion that the franchisees' lost profits were foreseeable to DirectBuy and therefore recoverable as direct damages.

**ACCORDINGLY:**

Defendant DirectBuy Inc.'s motion to dismiss plaintiffs' first amended complaint [DE 35] is DENIED.

**SO ORDERED**.

ENTERED: October 29, 2015

/s/ Philip P. Simon

**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**